Filed 9/6/13  Copenbarger v. McNaughton CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PAUL D. COPENBARGER, | |
| Plaintiff and Appellant, | G046975 |
| v. | (Super. Ct. No. 30-2008-00106367) |
| KENT A. McNAUGHTON, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, John C. Gastelum, Judge.  Affirmed in part and dismissed in part.

HamptonHolley and George L. Hampton IV for Plaintiff and Appellant.

Prenovost, Normandin, Bergh & Dawe, Michael G. Dawe and Kristin F. Godeke for Defendant and Respondent.

\*          \*          \*

**INTRODUCTION**

Paul Copenbarger appeals from a judgment confirming an arbitration award in favor of his former business partner, Kent McNaughton. Copenbarger and McNaughton formed a limited liability company to develop a parcel of land in Hawaii. They fell out over whether McNaughton had to buy Copenbarger out and wound up suing each other in Orange County Superior Court. The trial court ordered the case to arbitration, over Copenbarger's objection that McNaughton had waived the right to arbitrate. Copenbarger appeals from the order granting the petition to compel arbitration.

The subsequent arbitration award was a mixed bag, with Copenbarger prevailing on some of the claims and McNaughton on others. The trial court denied Copenbarger's motion to vacate the award, and granted McNaughton's petition to confirm it.

Copenbarger appeals from one of the arbitrators' rulings, which gave both him and McNaughton control over the project, as they had had in their prior business dealings. Copenbarger asserts that the arbitrators exceeded their powers when they rewrote the company's operating agreement to restore joint control. The rest of the award, as he recognizes, is not subject to correction on appeal.

We affirm the order granting the petition to compel arbitration. Although, as the trial court recognized, McNaughton's delay in requesting arbitration was troubling, we see no basis for disturbing the trial court's ultimate conclusion that he did not waive arbitration.

That determination having been made, the rest of the appeal is moot. We agree with Copenbarger that the arbitrators exceeded their powers by re-writing the operating agreement, but restoring the agreement to its original form would accomplish nothing. The limited liability company is out of business, so it no longer matters who controls it. This portion of the appeal must be dismissed.

2

**FACTS**

In 2006, McNaughton found some property on the island of Maui that he thought could be profitably developed as commercial real estate. He sought investors to go in with him on the project. Among the people he approached was Copenbarger, with whom he had participated in several successful real estate ventures in the past. The one in Hawaii, however, was the biggest project McNaghton had yet undertaken.

McNaughton found two other investors who were willing to put some money into the project. Most of the upfront money, however, was his and Copenbarger's.[1] As they had done in two prior real estate deals, McNaughton and Copenbarger agreed to share control of the project. McNaughton would be in charge of day-to-day operations, and Copenbarger would oversee the project's legal affairs. The other two investors would be "economic interest holders," without any significant ability to control operations.

The development was to proceed in three stages, with a different limited liability company for each one. At some point, however, the structure changed, and Keawe Commercial Center, LLC (Keawe), became the "umbrella" company, with three subsidiary limited liability companies of which it was the sole member.

The project also changed in other ways. Initially, Copenbarger and McNaughton agreed that the operating agreement for Keawe would be essentially a duplicate of the prior agreements they had had for earlier projects. The first draft of the Keawe operating agreement was in fact a former agreement with some minor adjustments to take into account the new circumstances.[2] The agreement went through several drafts as the closing date of June 19, 2006, drew nearer.

---

[1] McNaughton also negotiated a loan from First Hawaiian Bank. Copenbarger and McNaughton guaranteed the loans.

[2] To start the drafting process, the parties used an agreement from a prior project as a template for the Keawe operating agreement.

3

The final version of the agreement made a significant alteration in the provisions concerning control of the project. Instead of control shared between McNaughton and Copenbarger, McNaughton would have "full, complete, and exclusive authority, power, and discretion to manage and control the business, property, and affairs of [Keawe], to make all decisions regarding those matters and to perform any and all acts or activities customary or incident to the management of [Keawe's] business, property and affairs."

Copenbarger executed the Keawe operating agreement on or after June 9, 2006. He and McNaughton also entered into a separate agreement, the buy/sell agreement (of which more anon), which McNaughton signed on June 14. The deal closed on June 19.

The Keawe project failed to perform as expected, and Copenbarger notified McNaughton on January 9, 2008, that he was exercising his right to be bought out under the buy/sell agreement. When McNaughton indicated that he would not honor the agreement, Copenbarger filed suit to enforce it in Orange County Superior Court in May 2008. His complaint consisted of one count, for breach of the buy/sell agreement.

McNaughton fired back with a cross-complaint, filed June 6, 2008. He filed an amended cross-complaint on August 5, 2008, seeking declaratory relief, damages for breach of contract and breach of fiduciary duty, and rescission. Each cross-complaint included a copy of the Keawe operating agreement as an exhibit. Copenbarger filed his first amended complaint on December 5, 2008, expanding the causes of action to include breach of the operating agreement, breach of fiduciary duty, and several kinds of fraud.

4

McNaughton moved to compel arbitration on December 12, 2008, based on an arbitration clause in the Keawe operating agreement.[3] The trial court granted the petition and stayed the action.

The arbitration hearings took place between April 26 and April 30, 2010, before a panel of three arbitrators. The panel issued an interim award on May 26, 2010, and a final award, which included a ruling on attorney fees, on June 16, 2010.

The focus of the arbitration, and of the final award, was the enforceability of a separate buy/sell agreement between McNaughton and Copenbarger alone. Copenbarger testified at the arbitration that he had insisted on the agreement to counter his loss of control over the Keawe project. Copenbarger said that in early June, shortly before the deal was supposed to close, McNaughton stated he wanted to change the division of labor embodied in the prior deals: McNaughton in charge of daily operations, and Copenbarger overseeing legal affairs. According to Copenbarger's testimony, McNaughton wanted to get into real estate development in Hawaii. But to be successful, he thought he needed to have a free hand, without Copenbarger looking over his shoulder. McNaughton therefore sought to change the terms of the Keawe operating agreement to give him "full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of [Keawe]."

Copenbarger testified that he was willing to cede this control of Keawe to McNaughton, provided he had an escape hatch, i.e., the buy/sell agreement. Under the terms of this agreement, he could require McNaughton to buy his interest in Keawe if he

---

3    The arbitration clause provided, "Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in Orange County, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. As specifically provided below, attorneys' fees shall be awarded to the prevailing or most prevailing party. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law."

lost confidence in the project. [4] Copenbarger was not willing to invest $1 million of his own money in the project and personally guarantee a $5 million loan – and give up control – unless he could get out on favorable terms if things started to go downhill. He said he and McNaughton discussed the terms of the buy/sell agreement before the Keawe operating agreement was put into its final form.

McNaughton for his part testified that he had never discussed the buy/sell agreement with Copenbarger before June 14, 2006, when the agreement was faxed to him while he was in Hawaii closing the deal. He denied that he had ever asked for complete control of the project and was unaware that the operating agreement had been changed to give it to him. He said he was taken completely by surprise when he received the buy/sell agreement, and he signed it only because the deal was going to fall through without Copenbarger's $1 million investment and his loan guarantee, which he understood would not be forthcoming if he did not sign. If the deal did not close, at the very least McNaughton would lose all his escrow deposits and still be liable for loans he had guaranteed.

In arbitration, McNaughton argued that the buy/sell agreement was not enforceable for at least two reasons.[5] First, Copenbarger was his attorney, and Rule 3-300 of the Rules of Professional Conduct prohibits attorneys from entering into business

---

[4] The buy/sell agreement also gave McNaughton the power to force a sale of Copenbarger's interest, and, depending on how the Keawe project performed, the agreement was going to be a bonanza for somebody. If the project did well, McNaughton could make Copenbarger sell at a steep discount. If the project did poorly and Copenbarger exercised his rights, McNaughton would have to buy Copenbarger out for a tidy profit.

[5] He argued that the agreement was not enforceable for several reasons, but the arbitrators discussed at length only two of the reasons in their award.

6

deals with their clients unless certain conditions are met.[6]  Second, Copenbarger had obtained his consent to the buy/sell agreement by duress.

The arbitrators found Copenbarger's testimony about the origin of the buy/sell agreement more credible; they believed McNaughton had demanded total control of the Keawe project and that Copenbarger had tried to counterbalance his loss of control with an "exit plan," so that he could get out if Keawe did not perform as hoped.  The arbitrators dismissed the idea that Copenbarger had been McNaughton's attorney during the course of the project and that he had therefore violated Rule 3-300 of the Rules of Professional Conduct by engaging in a business deal with a client.  But they credited McNaughton's testimony he had signed the buy/sell agreement under duress, because he would face economic disaster if Copenbarger pulled his $1 million investment a few days before the Keawe deal was supposed to close.

The arbitration panel issued its final award on June 16, 2010.  The arbitrators set aside the buy/sell agreement as procured through duress.  They then modified the Keawe operating agreement to restore the divided control that had characterized the prior agreements between Copenbarger and McNaughton and that had been present in the early drafts of the Keawe operating agreement.  In essence, the parties were back where they were before McNaughton had asked for total control and before the buy/sell agreement existed.

Copenbarger moved to vacate the award on the grounds that the arbitrators had exceeded their powers by changing the operating agreement.  The trial court denied

---

[6]      Rule 3-300 of the Rules of Professional Conduct provides:  "A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:  [¶]  (A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and [¶]  (B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity seek that advice; and [¶]  (C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition."

7

the petition and confirmed the award, notwithstanding the alteration of the Keawe operating agreement. The trial court held that Copenbarger had acceded to the expansion of the arbitrators' powers by requesting rescission himself.

We requested supplemental briefing on Keawe's current status. The parties have informed us that Keawe is out of business, having wound up its affairs as of September 2012.

## DISCUSSION

### I.        Waiver of Right to Arbitrate

Copenbarger argued on appeal that McNaughton waived his right to compel arbitration in three ways. First, he failed to respond to Copenbarger's initial demand for arbitration, made after Copenbarger filed his original complaint. Second, McNaughton delayed seeking arbitration after he filed his own cross-complaint. Finally, McNaughton engaged in dilatory tactics after the court granted the petition to compel arbitration.

We dealt with the issue of waiver of the right to arbitrate last year in *Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436 (*Lewis*), and two years before that in *Burton v. Cruise* (2010) 190 Cal.App.4th 939 (*Burton*). We summarize the relevant law here as set out in those two opinions.

"Whether a party waived the right to contractual arbitration is a factual question we review under the substantial evidence standard of review. [Citations.] The trial court's 'determination of this factual issue, "'if supported by substantial evidence, is binding on an appellate court.'" [Citations.]'" (*Lewis, supra,* 205 Cal.App.4th at p. 443.) "''It was the trial court's duty to determine whether" the petitioners met their "burden of proof; it is our duty to determine whether there is substantial evidence to support the trial court's findings that it did.''' [Citations.]" (*Burton, supra,* 190 Cal.App.4th at p. 946.)

"Although the statute [Code of Civil Procedure section 1281.2] speaks in terms of 'waiver,' the term is used "'as a shorthand statement for the conclusion that a contractual right to arbitration has been lost.'" [Citation.] This does not require a

8

voluntary relinquishment of a known right; to the contrary, a party may be said to have 'waived' its right to arbitrate by an untimely demand, even without intending to give up the remedy.  In this context, waiver is more like a forfeiture arising from the nonperformance of a required act.  [Citations.]"  (*Burton, supra*, 190 Cal.App.4th at p. 944.)

"In *St. Agnes* [*Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187], the California Supreme Court adopted as the California standard the same multifactor test employed by nearly all federal courts for evaluating waiver claims. [Citations.]  [¶]  Specifically, the *St. Agnes* court identified the following as 'factors [that] are relevant and properly considered in assessing waiver claims':  ""(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party noticed the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps [e.g., taking advantage of judicial discovery procedure not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.'"  [Citations.]'  [Citation.]"  (*Lewis, supra*, 205 Cal.App.4th at p. 444.) With respect to the last factor, prejudice, "the critical factor . . . is whether the party opposing arbitration has been substantially deprived of the advantages of arbitration as a ""'speedy and relatively inexpensive'""' means of dispute resolution.  [Citation.]" (*Burton, supra*, 190 Cal.App.4th at p. 948.)

9

We recognize, as did the trial court, that this is a close call on the issue of McNaughton's delay in seeking arbitration after he filed his cross-complaint.[7] McNaughton's cross-complaint, based on the Keawe operating agreement, was filed on June 6, 2008, but he made no mention of any desire to arbitrate, even as he filed a first amended cross-complaint in August and participated in a case management conference. He did not file a petition to compel arbitration until December 12, 2008, after he had lost a discovery motion in October 2008. Nevertheless, the litigation based on the operating agreement was less than six months old when McNaughton made his formal demand for arbitration.[8] The minimal discovery he had sought was obtainable in arbitration, and Copenbarger was unable to demonstrate prejudice severe enough to overcome the strong public policy favoring arbitration.[9] (See *Lewis, supra,* 205 Cal.App.4th at p. 452.)

Unless we can say as a matter of law that the trial court made a mistake, we cannot reverse its finding of no waiver. (*Burton, supra*, 190 Cal.App.4th at p. 946.) The trial court had substantial evidence on which to base its finding, and this determination is binding on us. We therefore find no error in the granting of the petition to compel arbitration.

Copenbarger also argued McNaughton engaged in dilatory tactics *after* the court granted his petition to compel arbitration, thereby waiving his right to arbitration. Copenbarger made two efforts in the trial court to make McNaughton pay his arbitration fees. One was an ex parte application, which the court denied.[10] The second was a

---

[7] McNaughton's failure to respond to Copenbarger's demand for arbitration after the filing of the original complaint cannot constitute a waiver of his right to compel arbitration. Copenbarger's complaint was based solely on the buy/sell agreement, which had no arbitration clause.

[8] McNaughton made his demand for arbitration on November 20, 2008.

[9] In his opposition to the petition to compel arbitration, Copenbarger stated in conclusory fashion that he had "incurred monetary expenses in furtherance of the litigation responding to discovery, responding to discovery motions and preparing for trial," without any specifics as to the amounts expended and without distinguishing between amounts he would have had to spend to prepare for arbitration anyway and amounts for matters peculiar to litigation in court.

[10] In his ex parte application, Copenbarger did not ask the trial court to reconsider granting the petition to compel arbitration on the basis of McNaughton's post-petition delay in paying his AAA fees. Instead, he asked for an order compelling McNaughton to pay his fees or an entry of default against McNaughton.

10

voluminous attachment to an attorney declaration, filed in anticipation of a status conference on the progress of arbitration.

The threshold issue with respect to these requests for court action was whether the trial court had jurisdiction to entertain them, after the matter had been sent to arbitration. With respect to the ex parte application, the court held that it did not have jurisdiction.

The trial court had to determine whether it could hear the matter before it could decide whether McNaughton was misbehaving. Copenbarger did not identify lack of jurisdiction – the primary issue – as one of the issues on appeal, and he did not address this issue at all in his opening brief. Naturally enough, he also failed to provide any case authority for the proposition that a court may hear matters pertaining to an arbitration after it has granted a petition to compel arbitration and a stay.[11] We may therefore treat the issue as abandoned. (See *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 538.)

## II.        Mootness

We agree with Copenbarger that the arbitrators exceeded their powers when they rewrote the Keawe operating agreement to grant partial control of Keawe to him. But the issue is now moot, because, as both parties agree, Keawe is out of business.[12] As Copenbarger himself put it, working out what to do about the arbitrators' error would be even more futile than rearranging the deck chairs on a sinking ship; it would be tantamount to issuing new operating instructions to a ship at the bottom of the ocean.

"Appellate courts generally will not review matters that are moot. 'A case is moot when the decision of the reviewing court "can have no practical impact or provide the parties effectual relief."'" (*Mercury Interactive Corp. v. Klein* (2007)

---

[11]        The only two cases cited by Copenbarger to support his argument, *Engalla v. Permantente Medical Group* (1997) 15 Cal.4th 951, and *Weisman v. Johnson* (1982) 133 Cal.App.3d 289, both dealt with delaying tactics that occurred *before* the granting of the petition to compel arbitration.

[12]        We requested supplemental briefing on Keawe's status in light of the provision in the operating agreement that the company's term expired on December 31, 2009.

158 Cal.App.4th 60, 78; see also *Vernon v. State of California* (2004) 116 Cal.App.4th 114, 120 [court's duty to decide controversies by judgment that can be carried into effect].)

This appeal is not entirely moot, because whether the petition to compel arbitration should have been granted is still a viable issue. Once we have determined that arbitration was properly compelled, however, there is nothing more to decide. Even assuming the arbitrators exceeded their powers by dividing control of Keawe between McNaughton and Copenbarger, there is nothing left to control. Keawe's business has been wound up, so it no longer matters whether McNaughton has sole control of the company or whether Copenbarger and McNaughton must share it. We cannot render a decision that will have any practical impact on either party.

## DISPOSITION

The order granting the motion to compel arbitration is affirmed. The remainder of the appeal is dismissed as moot. The parties are to bear their own costs on appeal.

BEDSWORTH, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

MOORE, J.